**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - -X

SALVATORE GITTO and PHYLLIS GITTO,

     Plaintiffs,

         Civil Action No. 07 CV 4771 (DC)

 - against -

A.W. CHESTERTON CO., INC., et al.,

     Defendants.

- - - - - - - - - - - - - - - - - - -X

  DECLARATION OF CAPTAIN ARNOLD P. MOORE, USNR (RET.), P.E

  I, Arnold P. Moore declare the following:

  1. I have been continuously licensed as a Professional Engineer for over 27 years. I recently retired as the Sector Vice President, Engineering for a major builder of United States naval warships. I am also a retired Captain, Engineering Duty, United States Naval Reserve.

  2. I began my Navy career in 1968 immediately after receiving a Bachelor of Science degree from the United States Naval Academy with a major in Naval Science and a minor in Naval Architecture. I served eleven years of active duty in the Navy. During this time I concentrated on shipboard engineering and the repair and overhaul of Navy ships.

  3. My first two tours of duty were in the engineering departments of steam powered naval ships. During these tours I qualified as a Surface Warfare Officer and as the Engineering Officer of the Watch on the heavy cruiser USS Newport News. From 1972 until 1975 I was a Navy sponsored graduate student at the Massachusetts Institute of Technology in the Naval Ship Design and Construction curriculum. This three year program focused on a number of courses upon steam propulsion and shipboard machinery and included courses in thermodynamics, fluid dynamics, heat transfer, and materials science as well as boiler, turbine and pump design. I received both a Master of Science degree in Naval Architecture and Marine Engineering and the Professional Degree of Ocean Engineer from MIT. Upon graduation from MIT, I was assigned to Charleston

1

Naval Shipyard as a Navy Engineering Duty Officer. This tour included two years as a Ship Production Superintendent responsible for directing all repair work during overhauls of steam propulsion destroyers and nuclear submarines. This job provided daily contact with shipyard workers. I also served two years in the same shipyard as an overhaul program manager responsible for financial management, work authorization and customer interface.

4.  In 1979, when I completed my obligated service for my post graduate education at MIT, I resigned my active duty commission and entered both my civilian career and the Naval Reserve. My first civilian job was with the Charleston Office of M. Rosenblatt and Son, Inc., a marine engineering design firm. I served 18 months as Chief Naval Architect and 18 months as Technical Director of this office. During that time we designed ship alterations to modernize destroyers, tenders and mine sweepers. As Technical Director I was also responsible for oversight of the preparation and review of Navy system technical manuals. This job included close interaction with Navy officials and employees during the review and approval process of technical manuals, drawings and other documents.

5.  From August 1982 until January 2007 I worked as an engineering executive at Ingalls Shipbuilding. This company was owned by Litton Industries until 2001 when Litton was acquired by Northrop Grumman. I entered Ingalls as Chief Naval Architect responsible for the leadership of over 300 naval architects, structural engineers and designers. Three years later, I was promoted to be Director, Design Engineering responsible for 1000 employees in all engineering disciplines involved in the design of new construction cruisers, destroyers and amphibious assault ships. My responsibilities included supervision of the group that worked with equipment manufacturers to prepare equipment and system technical manuals. This responsibility also required frequent interaction with Navy officials during the review process. In 1992 I was promoted to Vice President, Engineering responsible for a total of over 2000 engineers, designers and logistics personnel. In addition to the design of new construction warships I became responsible for Research and Development and Fleet Modernization Design. I continued to have responsibility for the group that worked with manufacturers in the development of technical manuals. I held the position of Vice President, Engineering for over 14 years until my retirement in January 2007. During my tenure as an engineering executive we designed six major classes of naval warships and were responsible for modernization of three additional classes.

6. Concurrently with my civilian career, I completed 15 years of service in the Naval Reserve as an Engineering Duty Officer. This service included two days of active duty each month and two weeks of continuous service each year. This service was spent at Naval Shipyards, Supervisor of Shipbuilding Offices at private shipyards and the Naval Sea Systems Command working on naval ship engineering projects on a wide variety of naval ship classes. I retired from the Naval Reserve as a Navy Captain (O6).

7. I am licensed in three states as a Professional Engineer and registered nationally with the National Council of Examiners for Engineering and Surveying (NCEES). I am a Life Fellow of the Society of Naval Architects and Marine Engineers (SNAME) and the winner of the SNAME William M. Kennedy Award for Shipbuilding Systems. I am also a Life member of the American Society of Naval Engineers (ASNE).

8. A true and correct copy of my current Curriculum Vitae is attached as Exhibit 1.

9. I am aware that a lawsuit has been filed against several Defendant corporations, including Eaton Hydraulics Inc., formerly known as Vickers, Incorporated ("EHI") by Plaintiffs who allege injury by Plaintiff Salvatore Gitto's exposure to asbestos and asbestos-containing products aboard certain Navy ships at the Brooklyn Navy Yard from 1951 to 1952 and from 1954 to 1966. These products include EHI pumps and valves. I also understand that Plaintiff alleges that Defendant corporations, including EHI, failed to warn Plaintiff of the hazards related to asbestos in such products. I am further aware that EHI seeks to remove this civil action to the United States District Court for the Southern District of New York. EHI has taken the position, based on the Declarations of Horne, Lehman and Wardwell, that EHI was prohibited by Navy specifications and standards from providing warnings concerning asbestos and asbestos containing products.

10. Based on my 26 years of experience as a Naval Officer, and my 27 years of experience as a Naval Architect and Marine Engineer directing the design of United States naval warships as well as my extensive review of Navy specifications and standards from the 1950's and 1960's, I can attest to the instructions the Navy required its equipment manufacturers to provide to warn of hazards associated with equipment delivered to the Navy.

11. Throughout the 1950's and 1960's and continuing to the present time, Navy specifications and standards specifically required equipment manufacturers and other vendors providing

3

materials to the Navy to provide warnings concerning hazards associated with their products. The hazards associated with exposure to asbestos and asbestos containing materials and equipment were not exempted from these requirements. I attest, based both on my own experience and the reading of Navy requirements and specifications, that the Navy relied heavily upon its manufacturers and vendors to identify hazards associated with their products.

12.     Attached as Exhibit 2 is a military specification, MIL-B-15071A (SHIPS) dated 20 October 1952, which details the Navy's requirements concerning the contents of technical manuals for electrical and mechanical equipment. This is the first known edition of a series of specification editions that govern the preparation of equipment technical manuals. All of the other editions of this specification for the 1950's and 1960's are included as Exhibits 3 through 8 and are discussed in the following paragraphs. Sections 3.4.1.1 and 3.5.1.1 of the 1952 edition specifically require a safety notice for "special hazards" involved with the product. Section 3.4.1.8.1 (f) requires instructions to maintain safety devices to prevent damage to equipment or injury to personnel. Section 3.5.5 specifically directs that two copies of manuals be shipped along with each unit of equipment. New pages are required by section 3.3.4.1 "when it is found necessary to include new information to augment the instruction book data". This requirement provides the mechanism to add hazard warnings to the manual if hazards are detected after the manual has been shipped.

13.     Attached as Exhibit 3 is the 16 August 1954 edition of the military specification discussed in paragraph 12, MIL-T-15071B (SHIPS). This is Exhibit 2 from the Horne Declaration. It invokes the same requirement for safety notices for hazards in sections 3.5.1.1 and 3.6.1.1. Section 3.5.1.8.1 also contains the same requirement to provide instructions to maintain safety devices. Section 3.2 not only requires shipping two copies of the manual with each unit of equipment but also provides for distribution throughout the Navy, including two copies to each Naval Shipyard. This clearly provides the mechanism to inform shipyard workers such as Mr. Gitto about hazards involving the equipment they are handling or installing. In fact section 3.6.1.3 requires "precautions" to be identified during installation of equipment. Section 3.4.5.1 contains the same language as the 1952 version for preparation of new pages for new information.

14.     Attached as Exhibit 4 is MIL-M-15071C (SHIPS) which is the 10 September 1957 edition of the military specification for mechanical and electrical technical manuals. Section 1.1 clearly states that the requirements in this manual are the minimum

4

acceptable requirements. Sections 3.3.3.2 and 3.4.3.2 provide for the usage of "emphatics" in capital letters to be provided adjunct to the text to highlight notes, cautions and warnings. "WARNINGS" are clearly required for: "operating procedures, practices etc, which will result in personal injury or loss of life if not correctly followed". Section 3.3.1.2.5 requires safety precautions as a part of operating instructions and section 3.3.1.2.6 requires safety precautions for installation instructions. Section 3.3.1.2.7.1 maintains language requiring instructions for maintenance of safety devices. Section 3.1.6.1 retains the requirement for new pages for new information. Section 3.6.1 requires the shipment of two copies of the manual with each unit of equipment and two copies be provided to each Naval Shipyard.

      15.    MIL-M-15071D (SHIPS) dated 6 June 1961 is attached as Exhibit 5. This is Exhibit 4 from the Supplemental Wardwell Declaration and Exhibit 2 from the Lehman Declaration. This specification states in section 1.1 that "The intent is to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to the detail requirements included herein." This statement clearly indicates that the United States Government intention at this time was to accept commercial practices which are governed by state law. Section 3.3.6 maintains the requirement to utilize capitalized notes, cautions and warnings for emphasis preceding applicable instructions. Section 3.1.7 requires instructions for precautions during equipment installation, section 3.1.9 requires safety precautions for operating instructions and section 3.1.10.1 requires that instructions stress the importance of properly maintaining safety devices to prevent damage to equipment or injury to personnel. Section 3.5 maintains the requirement for new pages for new information and section 3.7 maintains the requirement to ship two copies with each unit of equipment and to provide copies to Naval Shipyards.

      16.    Exhibit 6 is MIL-M-15071E (SHIPS) dated 15 April 1962 governing the preparation of Navy Equipment and Systems Manuals. Section 3.7.5 contains the same requirement as in prior revisions upon the use of "NOTES", "CAUTIONS" and "WARNINGS" preceding instructions. Section 3.3.3 defines the requirement for installation instructions to include precautions during equipment unpacking and handling as well as safety precautions during installation. Safety precautions during operation of equipment are required by section 3.3.4. Section 3.4.1.1 maintains the requirement to provide instructions for the maintenance of safety equipment and section 3.5.3.2 requires repair instructions to

include any "cautions or warnings which must be observed to protect personnel and equipment". Section 3.10.2 provides detailed instructions for providing new pages for new information.

17. MIL-M-15071F (SHIPS) dated 28 August 1967 is very similar to the 1962 version with the same language in the same numbered paragraphs as outlined in my paragraph 16 above. It is included as Exhibit 7 for completeness.

18. MIL-M-15071G (SHIPS) dated 1 August 1969 is enclosed as Exhibit 8. It has been reformatted when compared to earlier editions. Section 3.5.4.3.1 requires the use of capitalized "NOTES", "CAUTIONS" and "WARNINGS" as before. Section 3.5.6.3 requires instructions on safety precautions and maintenance of safety devices during preventive maintenance. Section 3.5.6.4 adds the requirement to include safety precautions when scheduling performance testing of equipment. Section 3.5.6.5 requires safety to be a specific element of planning equipment overhauls. Section 3.6.1 details the specific requirements for systems manuals and requires that an entire chapter be devoted to safety precautions. Section 3.6.3 requires that hazards associated with system operation and maintenance be described. Section 3.6.3.1 requires instructions regarding safety scope, safety concepts and specific responsibilities for safety. Section 3.6.3.4.3 requires that the specific hazardous components in each system be identified and described and that handling precautions for these components be described. Section 3.6.5.2 Operating Modes requires: "Emphasis shall be placed by the use of warnings on the safe operation of controls, which if operated improperly, could result in hazards to personnel or damage to equipment."

19. The UNIFORM LABELING PROGRAM - NAVY, dated 9/24/56, further documents Navy requirements that manufacturers provide warnings concerning hazardous materials. This document is Exhibit 9. Paragraph 1.c. of enclosure (3) to this document provides the Navy definition for a Class III, Toxic hazard as "Any industrial or military material which may give off a harmful vapor, dust, fume, or mist during handling or operations. The injurious effect may arise from one exposure (acute) or from repeated exposures over a prolonged period (chronic). The mode of entry into the body may be by ingestion, inhalation, or absorption through the skin." Paragraph 2 of the main body of this document states that "This instruction applies to the labeling of all hazardous materials throughout the Naval Establishment wherever distribution of hazardous chemicals and materials is made to the actual consumer (shop, office or unit). It applies to materials received from any supply source, provided the material is intended for ultimate use at

6

the local activity." Taken together these two paragraphs clearly apply to asbestos containing material delivered to a Naval Shipyard for installation aboard a Navy ship. In paragraph 2.a. this document refers the reader to the "Warning Labels Guide" published by the Manufacturing Chemists' Association for guidance on the type of labels to be affixed. This guide is discussed in the next paragraph of this declaration.

   20.    Exhibit 10 is entitled WARNING LABELS, Manufacturing Chemists Association and is dated April 1946: The forward to this document states that there is a need to furnish appropriate information in those cases where special precautions are necessary and that information concerning hazardous materials should reach every person using, transporting, or storing these items. It also states that the most practical means for the seller to disseminate this information appears to be labels affixed to containers. The forward also states that "a precautionary label does not take the place of safety equipment, such as goggles, airline respirators, gas masks, clothing, shoes etc." This statement clearly shows that appropriate safety equipment for use with asbestos and asbestos containing equipment was available in 1946 and in common use in industrial environments. Page 5 of this document provides definitions for hazardous substances. The definition for dust is "Solid particles generated by handling, crushing, grinding, rapid impact, detonation, and decrepitation of organic or inorganic materials such as rock, ore, metal, coal, wood, grain etc." Asbestos fully meets this definition. Page 7 of this document provides a label for use with "Harmful Dusts". It reads: "CAUTION: HARMFUL DUST. Avoid repeated breathing or skin contact. Wash thoroughly before eating or smoking. Keep away from feed or food products" This document, recommended by the Navy, indicates that there were recognized industrial guidelines concerning warnings for hazardous materials, including dusts such as asbestos fibers, and the use of safety equipment designed to protect workers from exposure to these hazardous substances.

   21.    Exhibit 11 is excerpts from a 136-page Foster Wheeler Technical manual dated August 1952 and entitled Instruction Book Main Boilers, DL 4 and DL 5, DD927/G&C-14. This book illustrates that cautionary language was in use in actual navy technical manuals in the early 1950's. For example pages 17 and 21 contain phrases such as "it is extremely important to", "make sure that" and "Caution, it is of the utmost importance".

   22.    A copy of the Navy magazine All Hands dated April 1957 is enclosed as Exhibit 12. It contains a "Five Minute Course on Navy Safety". One segment of this course stresses the importance

of reading equipment safety manuals. Several segments of the course also stress the importance of properly utilizing safety equipment.

23.     The Horne Declaration and its attached Exhibits are Exhibit 13 in my declaration.  In paragraph 12 of his declaration Horne states that "EHI would not have been permitted, under the detailed Navy specifications, associated regulations, and procedures , to affix any type of warning or caution statement regarding asbestos to the equipment intended for installation onto a Navy vessel, beyond those required by the Navy."  In fact the Navy did require that safety notices for "special hazards" be included in equipment technical manuals and that two copies of technical manuals be "packed with each unit of equipment".  These requirements are contained in paragraphs 3.2, 3.5.1.1 and 3.6.1.1 of the document that Horne cites as his authority, MIL-T-15071B (SHIPS) dated 16 August 1954. This document is Exhibit 2 in the Horne Declaration and Exhibit 3 in my declaration.  Later versions of this document contain similar language as I have detailed earlier in this declaration.  In paragraph 13 of his declaration, Horne cites section 3.4.7.1 of MIL-T-15071B (SHIPS) to state that the Navy had final approval over all technical manuals.  This is a correct and fully supported statement.  However, he goes on to say: "Any warnings regarding the dangers of asbestos were prescribed and proscribed by the U.S. Navy". This statement is not supported by MIL-T-15071B (SHIPS) or other editions of this military specification from the 1950's and 1960's.  I have never encountered a case in which a Navy official or employee has suggested that I ignore the direction provided by a Navy military specification or any other official Navy document.  Without an identified source for the statement that asbestos warnings were prohibited by the Navy, I must conclude that this statement is unsupported by any documentation and incorrect.

24.     Exhibit 14 consists of the original Wardwell declaration dated June 4, 2007.  In paragraph 12 of this original declaration Wardwell, in a statement almost identical to that made by Horne in paragraph 12 of his declaration states: "Eaton would not have been permitted, under the detailed Navy specifications, associated regulations, and procedures to affix any type of warning or caution statement regarding asbestos to the equipment intended for installation onto a Navy vessel, other than those required by the Navy." As I stated in more detail in paragraph 23 above, the Navy required that safety notices for hazards be included in equipment technical manuals and that manuals be packed with each unit of equipment.

25. The Supplementary Wardwell Declaration and its attached Exhibits are included as Exhibit 15 to this declaration. The first three sentences of paragraph 7 of this document contain language that is very similar to paragraph 12 of Wardwell's original Declaration and to paragraph 12 of Horne's Declaration. This subject is covered thoroughly in my paragraph 23. In sentence 4 of paragraph 7 of his declaration Wardwell cites MIL-STD-755 which is a document which illustrates symbols for labeling hazardous materials. Page 6 of this document presents a sample label with a toxic symbol that would have been entirely appropriate for labeling asbestos containing equipment had EHI chosen to do so. Paragraph 8 of Wardwell's Supplementary Declaration cites MIL-M-15071D (SHIPS) dated 6 June 1961 which I have included as my Exhibit 5 and discussed in my paragraph 15. Wardwell states: "This specification demonstrates that the Navy had final approval over all such technical manuals and that any warning, label or other caution statement on equipment installed on Navy vessels was explicitly prescribed or proscribed by the Navy, through, among other things, its review and approval of these technical manuals." This statement is almost identical to sentence 3 of paragraph 13 of Horne's Declaration. As I have stated in more detail in my paragraph 23 the statement that warnings were proscribed or prohibited by the Navy is completely unsupported by MIL-M-15071D (SHIPS) or any other edition of this document from the 1950's and 1960's. Again, I attest that this is an incorrect and unsupported statement based on both my review of Navy documentation from the 1950's and 1960's and my own personal experience in review sessions with Navy officials and employees. Paragraph 9 of Wardwell's Supplementary Declaration states that: "Contractors such as EHI could not place any warnings in such technical manuals unless they were explicitly reviewed and approved by the U.S. Navy, nor could they make any modifications to such manuals without the Navy's explicit direction." This is a correct statement. However no documentation has been presented that EHI placed the required warnings in its technical manuals or that the Navy would have directed their removal. In paragraph 10 Wardwell discusses an EHI technical manual for a variable delivery pump dated April 1963. It is interesting to note that EHI includes "CAUTION" emphatics as required by the military specification to prevent damage to equipment but no "WARNING" emphatics to prevent injury to personnel. In sentence 4 of this paragraph Wardwell states: "Through such contracts the U.S. Navy directed contractors such as EHI to include specific warnings on any of their products installed on such Navy ships, and prevented them from including any warnings beyond those required by the Navy." Based on my own experience and a thorough review of the documents that governed the preparation of technical manuals in the 1950's and 1960's, I attest

9

that this statement is entirely incorrect and unsupported by any documentation. The Navy relied upon equipment manufacturers who actually performed the detailed design of their own equipment to provide hazard warnings and safety precautions including "CAUTION" and "WARNING" emphatics whenever these manufacturers deemed these warnings to be appropriate. It is true that the Navy had review and approval authority over these manuals but no documentation has been presented indicating that the Navy directed removal of any warnings required by military specifications and placed in manuals by equipment manufacturers. In paragraph 11 Wardwell states that: "manufacturers could not deviate to comply with any state imposed warnings." However MIL-M-15071D (SHIPS) which Wardwell himself cites in this supplementary declaration states in paragraph 1.1: "The intent is to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to the detail requirements included herein." This sentence indicates the Navy's intent to comply with commercial practices which are governed by state law. The remainder of Wardwell's paragraph 11 is a restatement of points presented in earlier paragraphs.

26.   Exhibit 16 to this declaration is the Lehman Declaration and its associated Exhibits. In paragraph 9 Lehman states that "The Navy controlled the decision making with respect to instructions and warnings affixed to and accompanying every piece of equipment, including any warnings regarding asbestos hazards." The Navy did review warnings provided by manufacturer's but, as I have detailed in my paragraphs 23, 24 and 25, assigned responsibility to vendors to provide warnings and cautions applicable to their products. In paragraph 10 Lehman states: "The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling, including asbestos hazards." It is not clear what Lehman intends by the word "nature" but is clear that the Navy intent was to allow the manufacturers of equipment to determine what hazards their equipment contained. As described in my Exhibit 2 discussed in my paragraph 12, MIL-B-15071A (SHIPS) specifically required safety notes for special hazards. Later in paragraph 10 Lehman declares: "Indeed any warnings such as asbestos hazards were prescribed and proscribed by the U.S. Navy". Nearly identical statements were made by Horne and Wardwell and are completely unsupported by any documentation. As I have attested before a review of the documentation that governed the preparation of technical manuals in the 1950's and 1960's indicates that this documentation does not prescribe or proscribe any specific warnings but rather assigns the task of identifying warnings to equipment manufacturers. Sentence 3 of Lehman's paragraph 11 is very nearly

identical to language in Horne's Declaration paragraph 13 and Wardwell's Supplementary Declaration paragraph 8 and is discussed thoroughly in my paragraph 23.

27.   In summary my paragraphs 12 through 18 discuss the military specifications that governed the preparation of technical manuals for Navy mechanical and electrical equipment throughout the 1950's and 1960's.  These documents specifically place the requirement upon equipment manufacturers to identify hazards and safety precautions needed to handle, install, maintain and repair their equipment and to provide instructions in their manuals to maintain safety devices associated with their equipment. Beginning in 1957 manufacturer's were required to add capitalized emphasis in the form of "CAUTION" and "WARNING" statements to their manuals preceding potentially dangerous or hazardous operations. Manufacturers were required to pack equipment technical manuals with each unit of equipment so that safety and hazard warnings would be available to those handling and installing the equipment. Additionally vendors were required to provide copies to many Navy organizations including Naval Shipyards so that this information would be available to shipyard workers such as Mr. Gitto during installation, maintenance and repair of equipment.  New pages were required to be prepared by manufacturers whenever new information, including hazards, about their equipment became known.  MiL-M-15071D (SHIPS) required manufacturers to utilize commercial manuals or utilize commercial practices in their preparation.  This indicates Navy intent to comply with commercial practices consistent with state laws. My paragraphs 19 and 20 outline Navy and industry practices in the 1940's and 1950's for labeling hazardous materials including dust producing substances such as asbestos.  The use of practical safety equipment for dust producing hazardous materials is also discussed.  Paragraph 21 illustrates that cautionary language was incorporated into Navy equipment technical manuals in the early 1950's. The 1957 All Hands magazine indicates that the Navy encouraged the use of safety equipment and safety manuals.

28.   Horne, Wardwell and Lehman all attempt to make the same three points concerning the use of warnings in their declarations.  The first point they attempt to make is that manufacturers, such as EHI, were not permitted to affix warning or caution statements to equipment intended for installation aboard Navy vessels.  In fact manufacturers were required to include hazard warnings and safety precautions in their equipment technical manuals and were required to pack two copies of this manual "with each unit of equipment". MIL-M-15071D (SHIPS) even states that these manuals "shall be so placed that they are readily accessible prior to

11

removing the equipment." The second point that Horne, Wardwell and Lehman attempt to make is that because the Navy had review and approval authority for technical manuals it would have "prohibited and proscribed" an equipment manufacturer from including asbestos warnings in its equipment technical manuals. There is simply no basis for this presumption. My Exhibits 2 through 18 are the military specifications for preparing equipment technical manuals from 1952 until 1969. Nowhere in any of these specifications does the Navy either direct the use of a specific warning or caution or prohibit the use of any specific warning or caution. Instead the Navy places the requirement upon equipment vendors to identify hazards and safety precautions required for their equipment and to provide appropriate warnings and cautions for this equipment. I attest that based on my own extensive interface with Navy officials and employees involved in the review and approval of technical manuals, drawings and other documents, I have never been asked to remove a hazard or safety warning or caution. Nor have Horne, Wardwell or Lehman attested that they were ever asked to do so. The third point Horne, Wardwell and Lehman attempt to make is that a contractor such as EHI could not deviate from a Navy-dictated warning to comply with any state-law imposed warnings. In fact, as I just stated, no specific warnings were dictated by the Navy in military specifications governing the preparation of technical manuals. Vendors were free to include any warnings that they deemed appropriate for their equipment, subject to Navy review and approval. There are no regulations or documentation that I have reviewed or that have been presented by Horne, Wardwell or Lehman that would suggest that the Navy would have prevented any equipment manufacturer from warning about asbestos hazards associated with their products.

   I declare under penalty of perjury that the foregoing is true and accurate.

*Arnold P Moore*

Arnold P. Moore